PHENIX INS. CO. *v.* THE QUAKER CITY AND THE ISABELLA E. WILBUR.

*(Circuit Court, S. D. New York.    March 22, 1889.)*

COLLISION—MUTUAL FAULT—TUG SHIFTING TOW.

> Though a vessel engaged in shifting her tow is entitled to the undisturbed use of a sufficient area of the water to execute her movements, yet, if she moves voluntarily while a navigating vessel is dangerously near, keeping no lookout, and giving no signals, thus contributing to the ensuing collision, she is in fault, and liable for damages.

In Admiralty.    Libel for damages.    On appeal from district court.

The Phenix Insurance Company of Brooklyn libeled the steam-tugs I. E. Wilbur and Quaker City for a collision in which the canal-boat H. M. Burruss, towed by the former, was sunk at the loss of libelant. The opinion of the district court is as follows:

"BROWN, J.    In the afternoon of November 5, 1885, the steam-tug I. E. Wilbur, with two loaded canal-boats lashed on her port side, left the stakes at Jersey City, about opposite pier 1, North river, bound for Adams street, Brooklyn.    In the strong ebb-tide she crossed the North river, always heading somewhat up the river, so as to make an actual course nearly directly across, but dropping a little to the southward, and ran into the slacker water to the southward of pier A, whither she went for the purpose of transferring one of the canal-boats from the port side to the starboard side before going up the East river.    While shifting this boat the steam-tug Quaker City, with seven boats in tow, two of them being lashed on her starboard side, came out of the East river, bound for the Communipaw coal-docks, a quarter of a mile below the stakes, and running around the Battery within some 200 feet of the barge-office, and following along the shore in the slack water before heading across. The starboard boat of the front line of the tow came in collision with the starboard quarter of the Wilbur when nearly abreast of Castle Garden, whereby the boat was sunk, and her cargo of iron became a total loss.    The libelant, having paid the loss, sued both tugs to recover the amount paid.

"There is considerable conflict in the evidence as to the distance from the shore of the place where the collision occurred, and as to the heading of the two tugs at the time.    In such a conflict very considerable weight ought to be given to the course that is ordinarily pursued by experienced and competent pilots, like these, in the management of the vessels and tows under their charge in pursuing their undoubted objects.    This consideration is specially applicable to both of these tugs.    In this view, and considering also the respective opportunities of the witnesses for observing and of judging, and the matters which engaged their attention at the time, I find the following as the most probable facts:

"1. That the Wilbur came within the slack water to the southward of pier A, and to the eastward of the outer line of that pier, and rounded to somewhat, so as to be heading a little up towards pier A; that she thereupon stopped her engine, cast off the line of the boat to be shifted, suffered it to run ahead, and afterwards pulled the stern of this boat around across her own bows, preparatory to getting along-side of it; that in these maneuvers the Wilbur twice backed her engines, with some intervals of stopping between, and probably came within 300 or 400 feet of Castle Garden wall; that her pilot, while thus engaged, paid no attention to other vessels coming around the Battery, considering himself sufficiently out of their way, and that he

consequently did not heed or hear any whistles from the Quaker City until she was only about 100 feet distant, though previous whistles had been given by her.

"2. I think the Wilbur did undoubtedly back in the water during the maneuvers above referred to, and that by this backing she caused her stern to lap somewhat the Quaker City's bow, as she came near to her, though shortly before she was a little on the latter's starboard bow. The testimony of the Quaker City in this respect is entitled to superior credit, because it was peculiarly within the line of her observation; and because the attention of the Wilbur was not specially directed to this point; because actual backing of the boat, and not merely of the engines, was quite natural, and was a common act in pulling another boat around, and was necessary, unless there was sufficient head way of the tow previously to dispense with such backing; and because Mr. Johnson, who thinks his boat did not move back in the water, did not have equal means of observing as to this fact.

"3. The Quaker City did not pursue a direct course from the barge-office to the Communipaw coal-docks, but kept up in the slack water for the purpose of avoiding the strong tide further out before crossing. She had timely means of observing the work in which the Wilbur was engaged before reaching her; and when she got no answers to her previous whistles she was bound to have gone out into the stream further, or have given to the Wilbur a larger margin for her maneuvers in shifting her tow, and was in fault, therefore, for shaping her course so near to a tug evidently engaged in that business.

"4. I find that it was a common practice for tugs intending to cross to Jersey City in the strong ebb to move up towards pier A in the slack water before entering the strong ebb; that this practice was well known to the pilot of the Wilbur, and that, in view of it, he was bound to attend to the signals of vessels pursuing this customary or frequent course; that he should have observed that the line of the Quaker City's approach with her tow was too near to admit of his backing with safety, and that he should therefore, before backing, have given her cautionary signals of his intention to do so; and that, had he observed her previously, and waited a few minutes before the last backing of his engine, prior to the collision, as he might have done, and doubtless would have done had the approach of the Quaker City been observed, the collision would have been avoided.

"5. It is urged against the Wilbur that the final cause of the collision was her going ahead at full speed at the last moment, when the Quaker City had approached within 50 or 100 feet of her, and that by the swing thus given to her stern, and by that only, the collision was precipitated, which might otherwise have been avoided. The Wilbur's witnesses, on the other hand, contend that a worse collision would have happened had her engines not been put full speed ahead. It is impossible for me to reach any certain conclusion as regards what was best after they had approached so near to each other. That is a condition *in extremis*, in which considerable latitude is allowed to the judgment of each boat at the time, without attributing to either legal fault, even if the measure adopted under the pressure of the circumstances was not the best. The faults chiefly regarded by the law are those which have brought the vessels into such close quarters. It is upon these prior faults that I must regard both tugs to blame, and direct the damages to be divided."

*Frank D. Sturges*, for the Quaker City, cited:

*The Wilson*, 7 Ben. 367; *The Fanita*, 8 Ben. 11; *The Packer*, 28 Fed. Rep. 160; *The St. Johns*, 34 Fed. Rep. 763; *The Johnson*, 9 Wall. 146; *The Cambusdoon*, 30 Fed. Rep. 710; *The Free State*, 91 U. S. 200; *The Galileo*, 24 Fed. Rep. 386; *The Servia*, 30 Fed. Rep. 502; *The Maria Luigia*, 28 Fed. Rep. 247; *The Fairbanks*, 9 Wall. 420; *The Dexter*, 23 Wall. 69; *The Excelsior*, 12 Fed.

Rep. 195; *The Wesley Seymour*, 7 Ben. 539; *The State of Texas*, 20 Fed. Rep. 254; Mars. Coll. (2d Ed.) 311; *The Peckforton Castle*, L. R. 3 Prob. Div. 11; *The Seaton*, L. R. 9 Prob. Div. 1.

*E. D. McCarthy*, for the Isabella E. Wilbur, cited:

*The Maryland*, 19 Fed. Rep. 555; *McNally* v. *Meyer*, 5 Ben. 240; *The America*, 29 Fed. Rep. 304; *The J. T. Easton*, 27 Fed. Rep. 464; *The White Fawn*, 20 Fed. Rep. 649; *The Wm. H. Payne*, Id. 650; *The City of Chester*, 24 Fed. Rep. 91.

LACOMBE, J. No new proofs were taken in this court. The district judge held the Quaker City in fault because, seeking to take advantage of the slack water by hugging the shore while and after rounding the Battery, she shaped her course too near to the Wilbur, which she might have seen was engaged in the business of shifting a part of her tow, instead of going further out into the stream. That decision is affirmed. The Wilbur was held in fault (*a*) because she had no one to observe the movements and attend to the signals of approaching vessels; (*b*) because she gave no signals announcing her intention to back; and (*c*) because she backed when she did. It is contended on behalf of the Wilbur that when engaged in the operation of shifting her tow she was not a navigating vessel; and that her conduct as to giving signals, etc., is to be judged not by the rules for navigating vessels, but by those for vessels at anchor or berthed. Whatever force there may be in the contention that a vessel when so engaged is no longer a navigating vessel, and as such need not give the signals, follow the courses, and make the movements prescribed for such vessels, she certainly is not actually in the same condition as one at anchor, or fast to a pier. She is not absolutely at rest, but changes her position from time to time by voluntary as well as by involuntary movements. It may be held that the water within which she is executing her maneuver must be left free for her by other vessels, but even within that area she should move forward or backward only after exercising ordinary foresight to see if it has been so left. Because she may be helpless to take herself out of the way of collision with a vessel intruding into her water, it does not follow that she is equally helpless to refrain from such voluntary movements within that water as will make a possible collision inevitable. That the Wilbur did actually move backward in the water, and did by this backing cause her stern to lap somewhat the bows of the Quaker City as the latter came near her, is found by the district judge on conflicting testimony. Although such backward movement was one "natural, common, and necessary" to the maneuver of shifting a tow, and may not have been continued beyond the area usually required for the execution of such maneuver, it is hardly possible that any person of reasonable prudence would have undertaken such movement if aware of the close proximity of the Quaker City, and of her evident intent to intrude within such area. Had any one on board the Wilbur given proper attention to the movements of approaching vessels, the Quaker City and her probable course would have been noticed, and

the backing which finally precipitated the collision would no doubt have been delayed until she passed. For these reasons the decision of the district judge is affirmed.