## THE THREE BROTHERS.

### THE CLARE.

(Circuit Court of Appeals, Second Circuit. April 13, 1909.)

### No. 221.

1. COLLISION (§ 90*)—NAVIGATION RULES—NARROW CHANNEL RULE.

Article 25 of the inland navigation rules (Act June 7, 1897, c. 4, 30 Stat. 101 [U. S. Comp. St. 1901, p. 2883]), which provides that "in narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel," is not an inflexible rule, but only to be followed "when safe and practicable"; and, where it is manifest that an adherence to it will produce disaster, it is not only the right, but the duty, of the navigator to disregard it.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 183; Dec. Dig. § 90.*]

2. COLLISION (§ 90*)—NAVIGATION RULES—NARROW CHANNEL RULE.

Such rule applies to Harlem river; but when there is an ebb tide setting strongly against the Bronx shore at the bend below Kingsbridge, which makes it dangerous for a hawser tow going up to pass the bridge on that side, it is justifiable for such a tow, as is customary, to keep to the left-hand side of the river. Nor is a tug required to employ a helper, or divide her tow in order to avoid doing so, which would obstruct and delay navigation and increase the danger of accidents.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 183; Dec. Dig. § 90.*]

3. TOWAGE (§ 11*)—COLLISION BETWEEN TOW AND BRIDGE ABUTMENT—LIABILITY OF TUG.

A tug was proceeding up the Harlem river with two tows on hawsers, and was keeping on the Manhattan side in order to pass under Kingsbridge on that side, on account of the strong ebb tide, which made it dangerous to take her tows through the other side. Before reaching the bend below the bridge, she blew two bend signals, to which she received no answer, and in rounding the bend, when for the first time she could see the channel under the bridge, a scow which had been lying at the bulkhead was shifting her position and lay directly across the channel on that side, wholly obstructing it. The tug stopped her engines and maneuvered skillfully, succeeding in passing the scow; but one of her hawsers parted, and the forward tow struck an abutment of the bridge and was injured. *Held*, that the tug was not in fault for being on that side of the channel, but that the fault was that of the scow, which was needlessly permitted to obstruct the channel in shifting, and which should in any event have heeded the tug's signals and waited until she had passed.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 17–20; Dec. Dig. § 11.*]

Appeal from the District Court of the United States for the Southern District of New York.

The claimants of the tug Three Brothers appeal from a decree of the District Court for the Southern District of New York holding the tug solely in

fault for causing the scow Atlas, which was being towed by the tug, to collide with an abutment of Kingsbridge in the Harlem river. The damages to the Atlas were assessed at $1,184.15 and a decree was entered in her favor for $1,265.81. The petition against the Clare was dismissed with costs. The facts are sufficiently stated in the opinion of the District Judge, reported in 162 Fed. 388.

Alexander & Ash, for the Three Brothers.

Wing, Putnam & Burlingham (Charles C. Burlingham, of counsel), for the Clare.

Foley & Martin (William J. Martin and James A. Nelson, on the brief), for the Atlas.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. At the point where the collision occurred there is a sharp bend in the Harlem river, the channel at 212th street being at right angles to the channel above Kingsbridge. At the time of the collision a strong ebb tide, running three miles an hour, was setting on the Bronx shore. The navigable channel at this point is about 300 feet wide and on the Bronx side the Hudson River Railroad Company has built a sloping wall with large rough rocks under water for some distance out from the bulkhead line. In the center of the channel is an abutment upon which the double swing drawbridge rests.

The testimony is practically uncontradicted that it is unsafe to take a west bound hawser tow on the northerly side of the center abutment when the ebb tide is setting strongly on the Bronx shore. The danger of the tow striking the jagged rocks is so great that all tows bound for the Hudson river navigate at this point when the tide is ebb on the Manhattan side. The District Judge who saw the witnesses so finds. He says:

"Owing to the bend in the river from about north northeast to northwest, the ebb current sets strongly on the Bronx side of the river up to and beyond Kingsbridge. It was, therefore, unsafe for a hawser tow to be taken through the opening on the Bronx side during the ebb tide, as such an attempt would probably result in the tow striking the shore or the bridge abutment on that side. It was usual for tows of such character to pass through the Manhattan draw and the proper course for that purpose was to keep on the Manhattan side of mid-channel and to pass the bulkhead about 100 feet away."

The Three Brothers made up her tow at the power house, the scow Atlas heavily loaded being placed next the tug and the scow Driscoll, being light, was placed close astern of the Atlas. The tug then rounded to and proceeded up the river about 100 feet from the Manhattan bulkhead intending to pass the center abutment of the drawbridge on that side of the river. As soon as he got straightened out on his course, the master of the tug blew a long bend signal and soon after another signal of the same character. Neither was answered. Owing to the sharp curve in the channel and obstructions along the bulkhead it was impossible for the master to see the channel under the bridge or the scows moored at the Manhattan bulkhead until he was approximately opposite of 219th street. This proposition can be easily demonstrated by placing a straight edge on the chart, Exhibit A.

When the master of the tug first saw the Clare she had swung out from her dock directly across the channel he was intending to take.

It was then too late to maneuver so as to avoid disaster. Had he attempted to pass on the Bronx side, assuming he could have cleared the Clare, he would inevitably have swung the tow upon the rocks, if he had kept on he would have collided with the Clare. That his seamanship in this extremity was skillful is demonstrated by the result, as he succeeded in clearing the Clare and would probably have cleared the abutment had not his hawsers parted, permitting the Atlas to drift. The District Judge after examining the maneuvers of the tug in detail exonerates her from every charge of fault save one—that she was navigating on the wrong side of the river in violation of article 25 of the inland rules. 30 Stat. 101 (U. S. Comp. St. 1901, p. 2883). This rule is as follows:

"In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fair way of mid-channel which lies on the starboard side of such vessel."

Undoubtedly the Harlem river is a narrow channel and the rule, generally speaking, is applicable thereto but the rule must be construed in the light of common sense. Its purpose is to prevent collisions not to produce them. It is not an inflexible rule to be followed in all cases, and, where it is manifest that a blind adherence will produce disaster, it is not only the right but the duty of the navigator to disregard it. The rule so states explicitly. It must be followed only "when it is safe and practicable."

In the present instance we think it would have been both unsafe and impracticable to have followed it. It will probably be conceded that if a wreck, sand bar or sunken rock obstructs the starboard side of a channel, the navigator may take the port side. The situation disclosed by the proof differs only in degree from the one supposed. When the tide is running strong ebb the rocky shore at the convex of the bend is as much to be dreaded as a lee shore by a disabled ship. The danger was generally recognized and there was an understanding among rivermen that westward bound tugs should take the port side at this particular bend when the set of the tide required it.

The suggestion that the tug should have employed a helper or taken the boats through, one at a time, alongside imposes too heavy a burden upon navigation. Besides, it may well be doubted whether such a rule if established will not result in more accidents than the custom which now prevails. It will increase threefold the trips of the tugs around the bend, it will compel the tug to stop, dismember the tow, find dockage for one of the barges, lash the other barge alongside, leave her at some dock west of the bend, return for the other barge and reassemble the tow. It were strange if all this did not result in many disasters besides the delay, annoyance and expense sure to follow.

The narrow channel rule was intended to apply to tows made up in the ordinary way; a construction which disorganizes the towing system of a given locality and makes compliance with the rule so onerous as to be prohibitory should be avoided if possible. We think it much safer to regard this dangerous bend, when the ebb tide is running, as an exception to the rule. Steam vessels approaching the bend should

sound the usual signal and vessels obstructing the channel should give timely warning of their presence.

That the Clare was responsible for the collision we cannot doubt. She was lying at the bulkhead near the bridge. Outside of her was a loaded scow and in order to get the latter to the dock it was necessary to shift the Clare but this could have been done without permitting her to project more than 60 feet into the channel. She was 100 feet long and when seen by the approaching tug her bow was 25 feet from the loaded scow and her stern out beyond the center of the river, at least 150 feet from the bulkhead. The Manhattan draw was thus completely blocked while she remained in this position.

As we have said the mere shifting of her berth did not require her to swing across the channel but, assuming that it did, it was clearly her duty to give notice of such a dangerous maneuver. The place where she lay could not be seen by vessels approaching from either direction. Tugs and tows from the Hudson concededly were required to pass through the Manhattan draw and yet, without a word of warning, this unwieldy scow was permitted to drift out on a fast running tide directly across the course of vessels navigating the river.

The master of the Clare knew or should have known the conditions prevailing at this point and if he had not men enough to shift the Clare without permitting her to become a menace to navigation he should have given warning to approaching vessels or taken measures to ascertain that the river was clear before undertaking a maneuver so hazardous. Those on the Clare should have heard the two bend signals which the District Judge finds were given and suspended operations until the tug and tow had passed.

Having received no warning the master of the tug was justified in proceeding; he had no reason to expect that a helpless scow would be permitted to drift across his course. The moment he perceived the danger he acted promptly and efficiently and we agree with the District Judge in thinking that the navigation of the tug was free from fault. We cannot avoid the conclusion that the action of the Clare in obstructing the channel was the proximate cause of the collision.

The decree of the District Court is reversed with costs to the Three Brothers against the Clare and the cause is remanded to the District Court with instructions to enter a decree dismissing the libel as against the Three Brothers with costs and for damages and the costs of the District Court in favor of the libelant and against the Clare.