## THE FELIX TAUSSIG.

## DIAMOND–O NAVIGATION CO. v. MYSTIC S. S. CO.

(Circuit Court of Appeals, Ninth Circuit. May 4, 1925. Rehearing Denied June 1, 1925.)

### No. 4448.

**1. Collision ⟨⟩91—Failure of river steamboat to keep to right side and pass ocean steamer port to port in narrow river channel held justified by facts.**

Failure of river steamboat to keep to the right side and to pass ocean-going steamer, proceeding up narrow river channel, port to port, as required by Rules of Navigation, art. 25, *held* justified by the facts, making compliance with such rule unsafe and impracticable.

**2. Collision ⟨⟩98 — River steamboat should have repeated signals on failure of ocean steamer approaching in opposite direction to respond.**

Where river steamboat, about to leave narrow channel, had signaled to ocean steamer proceeding up the river that she intended to pass steamer to starboard, instead of port, but received no assent or signal from steamer, she should, as a precautionary act, have repeated her signals.

**3. Collision ⟨⟩102—Vessel held not liable, notwithstanding negligence, in view of evidence showing fault of other vessel sole cause of collision.**

River steamboat, which signaled to ocean steamer proceeding up river that she intended to pass ocean steamer to starboard, instead of port, and who proceeded without repeating signals on failure of ocean steamer to respond, *held* not liable for damages sustained in collision, in view of evidence showing that sole cause of collision was fault of steamer in not obeying whistles blown by river steamboat and heard by ocean steamer's lookout.

**4. Collision ⟨⟩105—Evidence held to prove sole cause of collision in river channel was negligence of ocean steamer in not obeying signals from river steamboat.**

Evidence *held* to prove that sole cause of collision between river steamboat and ocean steamer in narrow channel of river was steamer's negligence in not obeying whistles of river steamboat heard by steamer's lookout, but not reported by him to pilot.

Appeal from the District Court of the United States for the District of Oregon.

Libel by the Diamond-O Navigation Company against the Mystic Steamship Company, as claimant of the steamship Felix Taussig, her tackle, apparel, etc. Decree for claimant, and libelant appeals. Reversed and remanded.

The following plat is furnished as illustrative of the matters set forth in the opinion:

Erskine Wood, of Portland, Or., for appellant.

M. B. Meacham and Wilbur, Beckett & Howell, all of Portland, Or., for appellee.

Before ROSS, HUNT, and RUDKIN, Circuit Judges.

HUNT, Circuit Judge. This was a libel in rem against the steamship Taussig by the Diamond-O Navigation Company for damages resulting from a collision in the Columbia river, about off the town of Kalama, Wash. The libel was filed by the Diamond-O Navigation Company, not only for its own damages, but as bailee for damages to cargo which was on the barge, and most of which was lost. Upon the trial it was stipulated that proof of any damages should be postponed until the question of liability was decided. The District Court held there was no liability, and the Diamond-O Company appealed.

The facts are as follows:

On a clear, dark night in May, 1924, the Felix Taussig, an ocean-going steamer 395 feet long and 55 feet beam, drawing 17 feet forward and 19½ feet aft, under speed of between 9 and 10 knots an hour, was proceeding up the Columbia river from Astoria to Portland, Or., in charge of a licensed Columbia river pilot. The tide was running down and fairly strong. The Diamond-O, a Columbia river steamboat of stern paddle wheel type, 151 feet long and over 27 feet wide, with an oil barge lashed on her starboard beam, was going down the river carrying cargo. The oil barge was about 140 feet long and 30 feet wide; the bow of the barge projecting ahead of the bow of the Diamond-O. About opposite Kalama, in a bend of the river, there is a dredged ship channel; the elbow of the bend being about opposite the municipal dock at Kalama. The lower reach of the ship channel is marked by the Kalama channel range, and the upper reach by the Kalama channel south range. These ranges intersect off the end of the municipal dock.

The Diamond-O sighted the Taussig when the vessels were about 2½ miles apart; the Diamond-O then being opposite Ahles Point, above Kalama. The Taussig was then coming up on the Kalama channel range. After sighting the Taussig, the navigator of the Diamond-O concluded that the vessels would pass at the bend, drew off to the left-hand side of the channel, intending to pass starboard to starboard, and took a course which would carry the vessel out of the dredged channel, but into water of ample depth for her accommodation. This move was undertaken for the reason that it would give the ocean ship the entire channel, and also because it was deemed the safe course for the steamboat, in that, if the steamboat, with her tow, continued to go down on the right-hand side to make a port to port passage,

and the vessels should meet in the bend, the steamboat would cross the bow of the steamer, and might be caught between the steamer and the Kalama docks. When at a point a short distance above the Kalama municipal dock, but below the railroad dock, and just about the time she was leaving the dredged channel, the Diamond-O blew two blasts to the Taussig. The Taussig was then in the Kalama channel range below the bend just beginning to swing on the channel south range, the vessels then being about half a mile apart.

When the Diamond-O blew two blasts the Taussig blew one blast, but the single blast of the Taussig was exactly simultaneous with the first of the two blasts from the Diamond-O. The pilot of the Diamond-O did not hear the Taussig's single blast, while the pilot of the Taussig heard only the second of the two blasts from the Diamond-O. The pilot of the Taussig mistook the second blast of the Diamond-O for an answer to his one blast. The lookout on the Taussig failed to report to the bridge the two whistles from the Diamond-O, although it appears he knew of the simultaneous blowing. The Diamond-O continued on her course, which was taking her further out of the dredged channel. Immediately after hearing the one blast, the Taussig swung to the starboard or Oregon side, to follow the signal as her pilot understood it. The situation then became critical, and the Taussig put her helm hard aport and gave full astern orders. The Diamond-O held her course and speed, which was a little less than the Taussig's, until the continued swing of the Taussig toward her alarmed her pilot, whereupon he reversed, but about half a minute thereafter collision occurred, and the barge was cut in two by the stem of the steamer. No danger signals were blown by either vessel. The point of collision was between 500 and 600 feet out of the dredged channel, in the shoal water toward the Oregon side, and about abreast of the municipal dock at Kalama.

It was the opinion of the District Court that the vessels were approaching head on, or nearly so, and that the Diamond-O violated article 25 of the Rules of Navigation, which is as follows: "In narrow channels every steam vessel shall, when it is safe and practicable keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

In endeavoring to ascertain who was to blame for putting the vessels in the position where collision ensued, these facts are

to be considered: From the intersection of the Kalama ranges to the Kalama municipal dock is a distance of 350 feet, and 300 feet between the channel range and the harbor lines. In the lower part of the bend there appear to be 300 feet between the Kalama channel ranges and the harbor line. With docks and possible small craft tied to the docks, and the possibility of the ocean steamer sheering on either side of the range, and of what is called an overrun in making a turn, the space left for the Diamond-O with her barge to pass would have made a port to port passage dangerous. The Diamond-O had also to consider the current, and the danger of not being able to get back into the channel, but of sliding into the docks.

A disinterested pilot of many years' experience on the Columbia river was asked what would be a proper passage, where a towboat coming down the river from Ahles Point toward Kalama meets an ocean-going ship coming up, and it appears they would meet somewhere in the vicinity of the intersection of the ranges, say at Kalama. Witness answered that he would give the ocean ship a starboard signal and go next to the sand, thus giving the channel to the steamer. He added: "On account of the channel coming up close to the shore, and specially at night coming down, a man with a tow, if he would take to the port side, would throw him too close to the docks there. The bend of the river, the way the river makes the bend there, it would throw him too close. He has plenty of room outside, and he always aims to take the outside next to the sand."

One of the witnesses for claimant, a master and pilot of many years' experience on the Columbia river, said that, if the Diamond-O was where the chart shown him indicated she was at the time she blew two whistles, it would not have been safe for her to go to the right, and all that she could do was to go over to the Sand Island side, although in his opinion, if the whistles had been blown when the Diamond-O sighted the Taussig (abreast of Ahles Point), she should have kept to the Washington side. Witness did not regard the vessels as being in the position of head on, and gave it as his opinion that it was bad practice to cut across the bow of any ship coming up. Upon the assumption that the positions of the vessels were as marked upon the chart, witness said that he would begin to haul over toward Sand Island, as did the Diamond-O. Several witnesses for libelant testified to the same effect.

While it is impossible to fix precisely when the Diamond-O sounded her whistles, we gather from the evidence that it was as she was going down the left side, and just before she hauled out of the dredged channel. Her pilot testified that when he first saw the Taussig he estimated that the vessels would pass at the bend; that as he came down he saw the starboard light and the mast light of the Taussig well open, and observed that the ship turned a little to the right as she came up to the Kalama channel range; that he expected an answer to his whistles, but kept his course, believing the Taussig would come on the ranges and keep the channel; that when the Taussig's light came around, so he could see her masthead lights, she was still swinging; and that as she did not give any signal he knew something was wrong, so he stopped the Diamond-O, backed, and tried to pick up headway and to avert the collision.

[1-3] Although it is a close question, our best judgment is that under the facts it was not safe and practicable for the Diamond-O to keep to the right side and pass the Taussig port to port, and therefore we think that the Diamond-O was justified in undertaking to proceed contrary to the general requirements prescribed by rule 25. But it is very clear that the vessels were about a half a mile apart when the Diamond-O whistled and the coincident blast of the Taussig was given. At once, then, the practical situation became this: The Diamond-O, about to leave the channel, had signaled by two blasts that she intended to pass to starboard, instead of port, but got no assent or signal of any kind. What ought the Diamond-O to have done? Persisted in her course over into the shoal water, supposing that the Taussig would approach in the channel, or repeated signals and made certain that the Taussig had heard and understood? The answer is, as a precautionary act, she ought to have repeated her signals. The Victory, 168 U. S. 410, 18 S. Ct. 149, 42 L. Ed. 519; The Three Brothers, 170 F. 48, 95 C. C. A. 322. But, though the Diamond-O may be criticized for not taking that precautionary measure, still, if it appears that her action in that respect did not contribute to the result, and that the immediate sole cause of the collision was negligence on the part of the Taussig, then the Taussig, and not the Diamond-O, should be held liable.

The evidence is that the two blasts of the Diamond-O were heard by the lookout of the Taussig, and that at that time the Taussig was just below the bend, commencing to

swing on the ranges, probably a few feet off; her green light showing to the Diamond-O, and the pilot of the Taussig observing the side lights of the Diamond-O. At that time the vessels, by evidence and chart markings, must have been at least half a mile apart. Therefore, if the Taussig had obeyed the two whistles blown by the Diamond-O and heard by the lookout, there would have been no collision, for she would have kept to the dredged channel, while the Diamond-O, keeping her course, passed out of the dredged channel to the shoal water.

[4] Beyond question culpable lack of vigilance or misconception of his duties on the part of the lookout was the primary cause of the collision. Standing at the forecastle head just before the collision, the lookout saw the tug when the Taussig blew her whistle, and also heard two whistles from the tug, but made no report, because he supposed the pilot also heard the whistles. The following excerpt from the testimony of the lookout is important:

"Q. What lights were showing on the tug? A. I could only make out the two mast lights.

"Q. You didn't notice the side lights? A. I never paid any attention to them.

"Q. What whistle did you hear from the tug? A. Two whistles.

"Q. At the time the first whistle was sounded, was there another sound? A. When the Felix Taussig blew one, and only one, the tug blew the first one at the same time.

"Q. The whistle from the Felix Taussig and the first whistle from the tug was simultaneous? A. I don't know that. * * *

"Q. Did you report those two whistles? A. Why, a pilot was aboard, sir, and I did not report it.

"Q. Answer the question, yes or no. A. No, sir.

"Q. Why didn't you? A. Why, it was the understanding that the pilot heard the whistles as well as me."

In The Ariadne, 13 Wall. 475, 20 L. Ed. 542, the Supreme Court said: "The duty of the lookout is of the highest importance. Upon nothing else does the safety of those concerned so much depend. A moment's negligence on his part may involve the loss of his vessel, with all the property and the lives of all on board. The same consequence may ensue to the vessel with which his shall collide. In the performance of this duty the law requires indefatigable care and sleepless vigilance. * * * It is the duty of all courts, charged with the administration of this branch of our jurisprudence, to give it the fullest effect whenever the circumstances are such as to call for its application. Every doubt as to the performance of the duty, and the effect of nonperformance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary." The Sunnyside, 91 U. S. 208, 23 L. Ed. 302.

The excuse offered by the lookout, that the pilot was in charge, cannot be accepted. A lookout must use his ears, as well as his eyes, and must report what he hears as well as what he sees. Suppose that in a thick fog a lookout hears the bell of a ship, or the sound of a fog horn in the distance; he cannot know what the pilot might do if he were informed concerning the sounds. His duty is to report. And in this case, if the lookout had reported that the Diamond-O had blown two blasts, the pilot could, and as an experienced navigator doubtless would, have avoided collision.

We therefore cannot perceive how the Taussig can escape responsibility for the negligence of the lookout, or how the case can be withdrawn from within the general rule that, where a proven failure on the part of the lookout has directly contributed to the disaster, liability is upon the ship whose fault caused the damages. The Pennsylvania, 86 U. S. (19 Wall.) 125, 22 L. Ed. 148: The Westhall (D. C.) 153 F. 1010.

The decree is reversed, and the cause is remanded for proof of damages.

Reversed and remanded.